IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TIMOTHY L. NEWMAN,**                    Case Number 5:14 CV 1325

      Petitioner,                    Judge James Gwin

      v.                    Magistrate Judge James R. Knepp, II

**JASON BUNTING, WARDEN,**

      Respondent.                    REPORT AND RECOMENDATION

### INTRODUCTION

Petitioner Timothy Newman, a prisoner in state custody, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Respondent Warden Bunting filed a Return of Writ (Doc. 5) with attached exhibits, and Petitioner filed a Reply (Doc. 7). The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated June 20, 2014). For the reasons discussed below, the undersigned recommends the Petition be denied.

### FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings were erroneous. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. Ohio's Sixth District Court of Appeals set forth the following findings of fact:

On September 10, 2010, appellant was indicted in a multi-count indictment alleging two counts of violating R.C. § 2913.31(A)(2), complicity to commit forgery, and one count of violating R.C. § 2913.31(A)(2), forgery, and one count of violating R.C. § 2913.45(A)(1), defrauding creditors. On January 14, 2011, appellant was indicted in a multi-count indictment alleging a violation of R.C. § 2923.32(A)(1), engaging in a pattern of corrupt activities; ten counts of violating R.C. § 2913.02(A)(3), theft; nine counts of violating R.C. § 4505.19(A)(2), transferring a motor vehicle without delivery of the certificate of title; and five counts of violating R.C. § 4505.18(A)(2), display of a motor vehicle without obtaining a manufacturer's or importer's certificate of title. Following a trial on June 14, 2011, the jury found appellant guilty of all of the charges in both the 2010 and the 2011 indictments.

\* \* \* \* \*

The following evidence relating to the theft charges was admitted at trial. Gary Wichman, a Sandusky police detective, testified that as his department began reviewing daily complaints gathered by the patrol division, a pattern began to appear in the frequent complaints regarding appellant and his business, Newman Motors. Victims complained of purchasing vehicles from appellant but not receiving the titles. When the first complaint was made, the prosecutor classified it as a civil matter; but, when the number of complaints increased, the detective began to investigate further. An officer went to appellant's business and questioned him as to whether he held the titles to the cars he was selling. Appellant was able to show the officer titles to the cars he had on his lot, although one car had a Michigan title. When the detective investigated further, he discovered that an investigator for the Bureau of Motor Vehicles, Robert Gallo, was investigating similar complaints filed in Erie County.

Robert Gallo testified that after several complaints were received by the department regarding appellant's failure to provide title or memorandum of title to purchased vehicles, Gallo began to investigate. Gallo explained that by Ohio law, a purchaser of a vehicle is supposed to receive the certificate of title to the vehicle (for a cash purchase) or a memorandum of title (for a financed purchase) within 40 days from the date of purchase. When the customer's temporary 30–day license tag expired and the customer sought a second temporary tag, they were also required to fill out a dealer complaint form so that the department could investigate the cause for the delay in providing the title or memorandum of title. After the second temporary tag expired, the customer would receive additional temporary tags solely by approval of the department. The cost of each temporary tag is $18.50. Each dealer also has a limited number of dealer license plates that can be placed on any of their vehicles. Furthermore, a dealer is generally not permitted by law to sell an automobile for which they do not have a certificate of title. An exception is made for cars the dealer acquires through financing if the dealer is a member of the Ohio Title Defect Rescission Fund. By participating in the fund, a dealer may sell cars even though the dealer has not yet obtained title to the vehicle. Appellant was prohibited from offering for sale any out-of-state vehicles until he had the vehicles inspected and obtained an Ohio certificate of title.

2

As a result of his investigation, Gallo discovered nine customers who never owned the vehicles they purchased and, in some cases, Newman Motors never owned the vehicle at the time of the sale. Five of the customers could have been given good title, but they did not receive the title because appellant had not yet paid off his loan, which had enabled him to purchase the vehicles. Gallo visited appellant's dealership on January 5, 2011. Gallo discovered that appellant had five vehicles illegally on display for sale because he did not have certificates of title for the vehicles.

Gallo further explained that the Ohio Title Defect Rescission Fund, formed by the Ohio Dealers Association and administered by the Ohio Attorney General's office, reimburses customers who do not receive their titles. Gallo testified that appellant remained a member of the fund until the fund had to reimburse one of appellant's customers, Gertrude Henry, on October 1, 2010, because she did not receive the title to her car. As of that date, appellant could only participate in the fund if he posted a bond. From that date onward, Gallo explained, appellant was prohibited from selling cars unless he held title to the car under Ohio law. Gallo knew appellant was no longer a member of the fund through his communications with the Attorney General's office, but acknowledged that appellant was not formally notified of this fact until he received a March 1, 2011 letter from the Ohio Attorney General's Office indicating that he would be removed from the fund as of October 1, 2010 unless he posted a bond. Gallo believed it was appellant's duty to know whether he was a member of the fund. Therefore, by failing to give a customer their title, appellant knew that he could be removed from the fund and no longer be able to sell cars he did not own. Gallo further testified that appellant's license had not been revoked as of the time of the trial because the ultimate goal of the bureau is to bring a dealer into compliance, not shut down his business.

Jeffrey Dreyer, President of Floor Plans Commercial Investment Associates, Floor Plans, Inc. (hereinafter "Floor Plans"), testified that his company supplied appellant with a floor plan for approximately a one-year period of time from 2009–2010. During this association, appellant was provided with funds to put vehicles on his lot for sale. When appellant would purchase a car, Floor Plans would advance the money for the purchase and appellant would receive title to the car in his name, subject to Floor Plans' lien, and appellant would forward the title or a copy to Floor Plans. Floor Plans would release its lien on the title and forward the title to appellant whenever the vehicle was sold to a customer and appellant paid off his loan. After appellant defaulted on his loan, Floor Plans repossessed all of the vehicles that belonged to them. For vehicles that appellant had sold but not delivered the title, and the customer had complained to the Ohio Attorney General's office requesting title, Floor Plans sent the customer the title. In those cases, Floor Plans would bear the loss.

Floor Plans also provided appellant with a "buy here, pay here program." Under that program, if a customer made only a down payment and sought to finance the remainder of the purchase, appellant would present Floor Plans with a contract between the dealer and the customer for the remaining balance. Floor Plans would

advance the money to appellant who would pay off his loan and Floor Plans would take title to the vehicle as collateral.

Through both programs appellant is currently indebted to Floor Plans for more than $100,000. By the time of trial, Floor Plans had either passed good title to the cars purchased through appellant to the state of Ohio at its request or directly to the purchasers of the cars.

Tonya Hughes testified that she purchased a vehicle for cash from appellant in February 2010. Appellant told her that he did not have the title for the car, but it would be coming soon in the mail. She had to get five temporary 30–day license tags. She contacted appellant throughout this time period, but he never produced the title. She no longer has the vehicle because it was taken away in June 2010 by a towing company who alleged that it was being repossessed by Tiffin Auto Auction because money was owed on the car. Hughes immediately went to appellant who agreed that an error had been made, disclosed to her that he was in bankruptcy, and loaned her a car. He also promised to look into the matter. He told her the next day that he had resolved the problem and she should be getting her car back within a week, but the car was never returned to her. After Hughes purchased a second temporary tag, she was instructed to contact Gallo and complete a complaint form. He instructed her to pursue relief through the Title Defect Rescission Fund, but that office told her that she would have to wait until the bankruptcy issues were resolved. Gallo testified that the car Hughes purchased was never legally owned by Newman Motors because title was in the name of Tiffin Auto Auction. Furthermore, the second car that appellant loaned to her was an out-of-state vehicle and did not have an Ohio certificate of title.

Joseph Work, who had a prior misdemeanor theft conviction, testified that he purchased a vehicle from appellant in March 2010. He paid cash for the vehicle, but did not receive the title to the car. He returned to appellant several times, but was never able to get the title. He asked for a refund after the second time he had to get a temporary tag, but appellant refused asserting he was in bankruptcy. As a result, Work had to repeatedly buy temporary 30–day license tags. Appellant gave him dealer tags at one point. In March 2010, Work learned he could obtain the title by calling a bank, but it required him to pay an additional $385 for the title and taxes, which Work asserted he already paid to appellant. Work filed a complaint at the title bureau and complained to the police department. The police told him it was a civil matter. Gallo confirmed that Work purchased the car from appellant but title transferred from Floor Plans directly to Work.

Martha Coss testified that she purchased a car from appellant in March 2010, that she was told was a 1991 model; but she learned from the owner's manual shortly before trial that it was a 1989 model. She also discovered that he gave her the wrong VIN number when she attempted to purchase a temporary 30–day license tag. He also told her that her title would be coming in a few days. She never received the title and has had to purchase temporary tags for a year. In March 2011, she was unable to drive the car any longer because it had so many things wrong with it, and she did not want to repair a car for which she did not even hold

the title. She repeatedly contacted appellant about getting the title. He told her to contact someone at an 800 number and she did, but was informed that she had no recourse. Coss also spoke with Gallo after she attempted to get a second temporary 30–day license tag. He directed her to fill out a complaint form for the Attorney General's office, but she has not heard anything from them. Gallo testified that Floor Plans holds the title to this car and has a repossession order on it and could seize the vehicle.

Janae Smoot testified that she purchased a vehicle from appellant in March 2010. She paid $2,000 in cash and agreed to pay $1,267 after she received her title. She purchased two temporary 30–day license tags and then obtained a dealer plate from appellant. Smoot had to return to appellant's business several times to attempt to get the title. The car was repossessed by Tiffin Auto Auction sometime after May 2010 along with all of her personal possessions. She questioned appellant and he insisted that she would be getting the car back. Finally, in August 2010, he offered to loan her a car until the matter was resolved. She still drives the loaned car with dealer license plates. He gave her a form saying it was a title or something from Michigan, but she was unable to do anything with the form. She did not make any further payments to appellant. She spoke to Gallo who had her fill out a report. Gallo confirmed that Smoot's first vehicle was repossessed by Tiffin Auto Auction which held title to the vehicle. Newman Motors never held title to this vehicle. Furthermore, Smoot did not take title to the second vehicle she was given by appellant either because it is an out-of-state vehicle.

Gertrude Henry, a 65–year–old widow, testified that she purchased her first car from appellant in April 2010. She visited appellant's business several times and told appellant that she would purchase a car after she received an insurance check she would be receiving because her prior automobile was totaled in an accident. Her insurance company called her afterward because appellant had been calling them about when Henry would receive her insurance check. When Henry purchased the car, appellant refused to accept the insurance check as part of the cash payment. Instead, he had someone at the dealership drive her to the bank so she could cash the check and pay appellant cash for the car. She never received the title for the car despite her repeated attempts to obtain it and had to keep purchasing temporary 30–day license tags. Appellant always promised the title was in the mail and eventually refused to take her calls. Appellant refused to refund her money. Eventually, Henry called the Attorney General's office to file a complaint. In October 2010, the Attorney General's Office, Consumer Protection Section, paid her for the vehicle out of the Title Defect Rescission Fund, the Attorney General's office took possession of the car, and she agreed to help them with their investigation. Henry chose to relinquish the car because appellant had indicated that there was only one minor problem with the car, but she later discovered the car needed repairs costing $1,500. Gallo testified that this vehicle was never titled to Newman Motors and Henry had an illegal dealer license plate on the vehicle. This vehicle was owned by Floor Plans.

Luz Galindo testified that she attempted to purchase a second car from appellant in 2010. Galindo put a deposit down on a car while she tried to secure a loan.

When the loan officer entered the VIN number appellant had provided into the computer, she could not locate the vehicle. The loan officer called appellant and he gave her a different number and the loan officer was able to pull up the information she needed. However, Galindo was unable to obtain the loan. Appellant never offered to finance the vehicle, but promised to work with her. In the meantime, Galindo determined that she would be able to obtain the money from another individual in April 2010. She asked appellant to return her deposit check back, but he convinced her to put down an additional sum for a total of $1,000 so he could hold the car for her until she was able to get the rest of the money.

When she returned to pay the additional sum, the car was not on the lot. Appellant explained that he had moved the car to his Tiffin lot because he was being audited. Because Galindo knew appellant and his family as her son's softball coach, she trusted him and gave him the rest of the money. She called appellant a few days before she was going to come in to complete the purchase of the car, but appellant never returned her phone calls. She did not get upset at the time because she knew that appellant's wife had cancer and was having surgery. Sometime later, she drove to the business to see appellant and as she turned into the lot, he was pulling out. She was certain that he had seen her. However, when she tried to call him on the company phone and his personal phone, appellant did not answer. Eventually, she was able to reach appellant and he stated that he no longer had the vehicle she had agreed to buy. He asked for some additional time to secure another vehicle and she agreed. When appellant did not produce another car, she called and insisted upon getting her money back. Appellant informed Galindo at that time that he was filing for bankruptcy and would not refund her money. He told her to take another smaller vehicle, even though it did not meet her needs, or she would never see her money again. She contacted a lawyer, but learned that she could not sue appellant if he had filed bankruptcy. After she learned that she could file a criminal complaint, she contacted the Sandusky police.

Joy Hillman testified that she purchased a car from appellant on May 22, 2010, for $3,500 cash. She did not receive title to the car that day and obtained a temporary license tag. Near the end of the 30–day time limit for the tag, she began questioning appellant about obtaining the title to the car. When Hillman complained about getting a second tag, appellant gave Hillman $20 to cover the cost of a second 30–day tag. At the end of the second 30–day period, Hillman still had not received the title to the car, and appellant gave her a dealer license plate to use. Uncomfortable with this arrangement, Hillman called the police. A detective directed her to call Floor Plans, which was a middleman company through which appellant purchased cars and held the title to her car. She discovered that Newman Motors never held title to the car. After Hillman proved that she had purchased the car, Floor Plans sent her the title.

Charlene Boesch testified that she purchased an automobile from appellant in June 2010. She paid a deposit and then paid the remainder in full when she received the car. She had to purchase ten temporary 30–day tags because she never received the title to the car. She attempted to reach appellant by telephone,

but he never answered or returned her calls. Her husband went to see appellant about the title, but he was not able to obtain it. After she had returned to the license bureau several times to purchase temporary tags, they put her in contact with Gallo. Eventually, in May 2011, she was able to get rid of the car and recover the purchase price through the Title Defects Rescission Fund. By that time, she had discovered that the car had several malfunctions she could no longer accept. Gallo testified that this vehicle was owned by Newman Motors and then Shaquilta Johnson, who financed the car. It appeared that appellant had either repossessed the vehicle or Johnson had returned it and appellant sold the vehicle without the ability to transfer the title.

Jessica Smith and her mother, Lora Smith, testified that Jessica Smith purchased a truck from appellant in October 2010. She paid $2,500 in cash and financed the remainder of the $4,799 purchase price. She did not make any further payments because she was unable to obtain a memorandum of title from appellant. Appellant told her that before obtaining the title, he would have to take the car back to have an out-of-state inspection and would deliver her the title after she made a payment. When she did not make a payment, appellant repossessed the car. Lora Smith complained to the police and Gallo about the matter and talked to appellant. Lora Smith further testified that appellant somehow convinced her that she should pay him approximately $800 to cover her daughter's missing payments and then she could reclaim the truck. She was not aware of the requirement to have the car inspected before title could be transferred. But, appellant never gave her the title either. From that time onward, she visited appellant once a week to make payments on the car and to inquire about the title. He always had an excuse as to why he did not have the title. Although Jessica Smith continued using the vehicle, Lora Smith never received a memorandum of title. She still owes appellant approximately $800 for the car.

Lora Smith acknowledged that her signature is on the back of the title and recognized it as a paper appellant asked her to sign one of the last times she visited him in January 2011. She denied that appellant ever asked her to return to sign a retail installment sales contract. She recalled that he asked her to come over because he had the title, but then after he had her sign the back of a paper which she did not read, he still did not give her the title. After she left that day, she called the police to report the situation again. Gallo testified that Newman Motors did not acquire title to this vehicle until January 2011. It appears to have been an out-of-state vehicle, which required a vehicle inspection before an Ohio certificate of title could be issued. Jessica Smith never received title to the car.

Appellant testified in his defense that he has been involved in car sales for over 30 years and his license, which was first obtained in the early 1990s, has never been revoked or suspended. He has been operating at the current business site for the last eight years and continued to operate it at the time of trial. Most of his customers were people he knew from the community, referrals, or returning customers. Ninety-five percent of his vehicles were purchased through Tiffin Auto Auction. He testified that he never sold a car for which he did not honestly believe he could obtain a title. He attempted to work with them no matter what

problems arose. He also believed that when an auction company assigned title to him that he had good title to sell the vehicle.

Appellant testified that he was not aware that he was removed from the Ohio Title Defect Rescission Fund until he received a letter from the Ohio Attorney General in March 2011 after it was hand delivered to him. Until that time, appellant believed he had the authority to sell the vehicles he had financed.

Appellant testified that when he sold a car to Work, Henry, Hillman, and Boesch, he had the right to sell the vehicles, he did not intend to deprive them of ownership of the vehicles, and attempted to accomplish the transfer of title within the forty-day time limit set by law, but was unable to do so. He further testified that with respect to Henry, when an inspection of the vehicle disclosed a $400 repair that was needed, he offered to discount the car $350.

Regarding the repossession of Hughes' and Smoot's automobiles by Tiffin Auto Auction, appellant testified that although he knew he was under a Chapter 7 bankruptcy at the time of the sales, he was advised that his customers who financed a vehicle would be protected from repossession. He later learned that he should have filed a Chapter 13 bankruptcy to achieve this goal. His attorney attempted, unsuccessfully, to resolve the issue. Appellant gave both Hughes and Smoot one of his vehicles to drive until the issue was resolved because of his concern for them. He even had to take a loss for Smoot because she never fully paid for her automobile. Floor Plans had cut off his line of credit in March 2010, called its note due, and removed almost all the vehicles appellant had on his lot. However, on cross-examination, appellant explained that he purchased the vehicles from the Tiffin Auto Auction with a check written on his Floor Plans credit line. When Floor Plans cut off his credit, the check was not honored. At that point in time, appellant owed Floor Plans over $100,000. Appellant denied knowing that his line of credit would be cut off. He asserted that the money he received from customers was being used to pay off his loan to Floor Plans.

Regarding Coss, appellant testified that he simply made a mistake regarding the model of the vehicle. When he had trouble with some customers like Coss who had paid cash and he was unable to obtain a title from Floor Plans, appellant provided the customers with a contact that would assist them in obtaining the certificate of title.

With respect to Galindo, he offered to return her deposit, but she agreed to pay him an additional $500 and then obtain other financing for the remaining balance. That car was on his lot after repossession so he could not sell it for a period of time. But, before Galindo returned, Floor Plans came and took the car. Appellant tried to get it back, but was unable to do so. Because he had already filed for bankruptcy, he told Galindo that he could not return her money, but offered her another car.

Appellant testified he sold Jessica Smith a vehicle he purchased at an auction in Detroit after Floor Plans cut off his credit line and he had problems with Tiffin

Auto Auction. After the sale, appellant told Smith that she would have to come back in two weeks to have an out-of-state vehicle inspection done so that he could obtain an Ohio certificate of title. He had never gotten around to getting it done before he sold the car. She never returned and when she did not make her payments, appellant repossessed the car. Even after repossession, he never had time to get the inspection done. When Lora Smith complained, appellant explained everything to her because Jessica had not told her mom that she had financed the car. Despite the fact that he could have repossessed the car, kept the down payment, and charged a fee, he worked out an agreement with Lora Smith for her to make lower payments on the car within a set period of time to regain the car. He finally got the inspection done in January 2011. After Lora Smith made all of the payments, he transferred title into her name. She was supposed to return to sign the security agreement, but she never did. He could not contact her because he had been charged with these crimes by this point and was barred from having any contact with the alleged victims. Since he never had her sign the security agreement, he was unable to place a lien on the vehicle and could not repossess it even though Lora Smith still owes him money for the car.

*****

At trial, appellant spent a considerable amount of time eliciting testimony from appellant's customers, who never received a certificate of title or memorandum of title, relating to their possession and control over the automobile. Appellant was attempting to establish that these customers were bona fide purchasers for value and, therefore, no theft occurred. However, this issue is unrelated to the alleged theft in this case: taking money from customers with the intent to deprive them of their money by deceiving them into believing that good title to the vehicle would be transferred. We find there was sufficient evidence presented to support the convictions for theft and, consequently, racketeering. Furthermore, we find the convictions are also supported by the manifest weight of the evidence.

(Doc. 5-1, Ex. 1).

## PROCEDURAL BACKGROUND

The relevant procedural history is undisputed by the parties and was accurately summarized in Respondent's brief, therefore it is incorporated herein with only minor changes. (Doc. 5, at 10-15).

### *State Trial Court*

Petitioner was indicted on September 10, 2010 by the Erie County Grand Jury for the three offenses previously noted above in the factual history. (Doc. 5-1, Exs. 2, 3). Petitioner was represented at trial by an attorney, who remains his counsel in this action.

Petitioner was indicted again on January 14, 2011 by the Erie County Grand Jury for the four additional offenses previously noted above in the factual history. (Doc. 5-1, Exs. 4, 5). Petitioner was represented by the same attorney for these offenses. The two cases were consolidated for trial purposes. (Doc. 5-1, Exs. 31, 36).

On June 20, 2011, the jury returned its guilty verdicts on all counts in both indictments. (Doc. 5-1, Exs. 6, 7). Later, on July 1, 2011, Petitioner was sentenced to an aggregate term of five years and 6-months imprisonment, which sentence is due to expire on November 25, 2016. (Doc. 5-1, Ex. 15). The sentence for the second indictment included a mandatory term of five years of post-release control. (Doc. 5-1, Ex. 15).

### *Direct Appeal*

Petitioner, through trial counsel, filed a timely direct appeal on July 29, 2011 from the judgments of conviction. (Doc. 5-1, Exs. 16, 17, 18, 19). The two appeals were ordered consolidated for purposes of appeal. (Doc. 5-1, Exs. 18, 19).

On April 13, 2012, counsel filed Petitioner's brief in which he presented the following six assignments of error:

> ASSIGNMENT OF ERROR NO. 1
> The trial court abused its discretion and prejudiced [sic] when the court failed to find that the defendant (who was in bankruptcy), was indigent based solely on a public defender's non-disclosed recommendation of having assets.
>
> ASSIGNMENT OF ERROR NO. 2
> The trial court erred, abused its discretion and prejudiced the defendant by ordering two indictments be tried together.
>
> ASSIGNMENT OF ERROR NO. 3
> The evidence was insufficient and the verdict was against the manifest weight of the evidence.
>
> ASSIGNMENT OF ERROR NO. 4
> The trial court erred, and abused its discretion, by giving improper jury instructions, including, but not limited to, indicating that the court takes "judicial notice of the fact and the law in Ohio, that in order to transfer property that relates to a motor vehicle, proof of ownership is a certificate of title. That's something

that is noticed. You'll accept that as a factual circumstance and then you'll see how that fits into your deliberation process." [sic]

ASSIGNMENT OF ERROR NO. 5
The court gave numerous improper jury instructions and off hand [sic] comments that prejudiced the defendant.

ASSIGNMENT OF ERROR NO. 6
The trial court committed plain error in giving an accomplice instruction and improperly commenting to the jury on what occurred with the co-defendant outside the presence of the jury.

(Doc. 5-20). The State filed a brief in response. (Doc. 5-21). The appellate court affirmed the

judgment of conviction on February 8, 2013. (Doc. 5-22).

***Ohio Supreme Court Appeal***

On March 25, 2013, Petitioner, through new counsel, filed a timely notice of appeal in

the Ohio Supreme Court from the direct appeal judgment(s). (Docs. 5-23, 24, 25). Petitioner's

counsel presented the following four propositions of law for review:

Proposition of Law One:
TRIAL COURTS ABUSE THEIR DISCRETION AND PREJUDICE A CRIMINAL DEFENDANT WHEN THE COURTS FAIL TO FIND THAT THE DEFENDANT WHO WAS IN BANKRUPTCY, INDIGENT BASED SOLEY ON A PUBLIC DEFENDER'S NON-DISCLOSED RECOMMENDATION OF HAVING ASSETS. State v. Tymico, 42 Ohio St.2d 39 (Ohio 1975) 325 N.E.2d 556

Proposition of Law Two:
A TRIAL COURT ERRS AND ABUSES ITS DISCRETION AND PREJUDICED THE DEFENDANT BY ORDERING TWO INDICTMENTS BE TRIED TOGETHER. State v. Schaim, 65 Ohio St.3d 51, 59, 1992-Ohio-31

Proposition of Law Three:
A TRIAL COURT ERRS, AND ABUSES ITS DISCRETION, BY GIVING IMPROPER JURY INSTRUCTIONS AND INVADES THE PROVINCE OF THE JURY BY INDICATING THAT THE COURT TAKES 'JUDICIAL NOTICE OF THE FACT AND THE LAW IN OHIO, THAT IN ORDER TO TRANSFER PROPERTY THAT RELATES TO A MOTOR VEHICLE, PROOF OF OWNERSHIP IS A CERTIFICATE OF TITLE. THAT'S SOMETHING THAT IS NOTICED. YOU'LL ACCEPT THAT AS A FACTUAL CIRCUMSTANCE AND THEN YOU'LL SEE HOW THAT FITS INTO YOUR DELIBERATION PROCESS' WHEN THERE ARE OTHER WAYS THAT A

11

PERSON CAN OBTAIN OWNERSHIP OF A VEHICLE BY MEANS OF OTHER THAT A 'TITLE'. State v. Rhodes (1982), 2 Ohio St.3d 74, 2 OBR 629

Proposition of Law Four:
A TRIAL COURT COMMITS PLAIN ERROR BY GIVING AN ACCOMPLICE INSTRUCTION AND IMPROPERLY COMMENTING TO THE JURY ON WHAT OCCURRED WITH THE CO-DEFENDANT OUTSIDE THE PRESENCE OF THE JURY DURING THE CO-DEFENDANT'S SENTENCING PROCESS

(Doc. 5-25).

On June 19, 2013, the Ohio Supreme Court declined jurisdiction. (Doc. 5-26). There was no further appeal from that judgment. The 90-day period for seeking certiorari in the United States Supreme Court expired on Tuesday, September 17, 2013, after which the one-year statute of limitations period in habeas commenced.

### FEDERAL HABEAS CORPUS

The instant counseled petition was timely filed by on June 18, 2014, less than a year after the expiration of direct appeal period on September 17, 2013. (Doc. 1). Petitioner's counsel presents the following six claims in habeas:

Ground One:
THE TRIAL COURT ABUSED ITS DISCRETION AND PREJUDICED WHEN THE COURT FAILED TO FIND THAT THE DEFENDANT (WHO WAS IN BANKRUPTCY), WAS INDIGENT BASED SOLELY ON A PUBLIC A PUBLIC DEFENDER'S NON-DISCLOSED RECOMMENDATION OF HAVING ASSETS

Ground Two:
THE TRIAL COURT ERRED, ABUSED ITS DISCRETION AND PREJUDICED THE DEFENDANT BY ORDERING TWO INDICTMENTS BE TRIED TOGETHER

Ground Three:
THE EVIDENCE WAS INSUFFICIENT AND THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

Ground Four:
THE TRIAL COURT ERRED, AND ABUSED ITS DISCRETION, BY GIVING IMPROPER JURY INSTRUCTIONS, INCLUDING, BUT NOT LIMITED TO, INDICATING THAT THE COURT TAKES 'JUDICIAL NOTICE OF THE

12

FACT AND THE LAW IN OHIO, THAT IN ORDER TO TRANSFER PROPERTY THAT RELATES TO A MOTOR VEHICLE, PROOF OF OWNERSHIP IS A CERTIFICATE OF TITLE. THAT'S SOMETHING THAT IS NOTICED. YOU'LL ACCEPT THAT AS A FACTUAL CIRCUMSTANCE AND THEN YOU'LL SEE HOW THAT FITS INTO YOUR DELIBERATION PROCESS'

Ground Five:
THE COURT GAVE NUMEROUS IMPROPER JURY INSTRUCTIONS AND OFF HAND COMMENTS THAT PREJUDICED THE DEFENDANT

Ground Six:
THE TRIAL COURT COMMITTED PLAIN ERROR IN GIVING AN ACCOMPLICE INSTRUCTION AND IMPROPELRY COMMENTING TO THE JURY ON WHAT OCCURRED WITH THE CO-DEFENDANT OUTSIDE THE PRESENCE OF THE JURY

(Doc. 1).

## JURISDICTIONAL ISSUES

Respondent argues grounds one, two, three, five, and six of the Petition should be dismissed as procedurally defaulted. (Doc. 5, at 22-23). The Court also finds that ground four presents a non-cognizable claim for relief.

### *Procedural Default*

Procedural default occurs when a petitioner fails to fairly present his claims in a federal constitutional context to the highest state court. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Anderson v. Harless*, 459 U.S. 4 (1982). Reasons of federalism and comity generally bar federal habeas corpus review of "contentions of federal law . . . not resolved on the merits in the state proceeding due to [the petitioner's] failure to raise them there as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); *Lundgren v. Mitchell*, 440 F.3d 754 (6th Cir. 2006). In Ohio, "one complete round of the State's established appellate review process" means a defendant must fairly present his constitutional claims, on the record, to the trial court, the court of appeals, and the Supreme Court of Ohio on direct appeal. *Caver v. Straub*, 349 F.3d 340, 346 (6th Cir. 2003)(quoting *O'Sullivan*, 526 U.S. at 845).

13

A habeas petitioner may fail to obtain consideration of a claim by a state court in two scenarios, either: (1) he failed to fairly raise the claim before the state courts while state remedies were still available, or (2) he failed to comply with a state procedural rule which prevented the state courts from reaching the merits of the petitioner's claim. *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977). In either of these scenarios, the claim is procedurally defaulted and may not be considered by the federal court on habeas review. *Seymour v. Walker*, 224 F.2d 542, 550 (6th Cir. 2000).

If the state argues a petitioner has procedurally defaulted his claims, the court must conduct a four-step analysis to determine whether the petitioner has indeed defaulted and, if so, whether the procedural default may be excused:

1. The Court determines whether there is a procedural rule applicable to the claim at issue, and whether the petitioner in fact failed to follow it;

2. The Court then determines whether the state courts actually enforced their procedural sanction;

3. The Court then decides whether the state's procedural forfeit is an "adequate and independent ground" on which the state can rely to foreclose federal review; and

4. Finally, in order to avoid default, the petitioner can demonstrate that there was "cause" for him to neglect the procedural rule, and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Demonstrating "cause" requires a petitioner to "show that 'some objective factor external to the defense' prevented the petitioner's compliance with a state procedural rule." *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Demonstrating prejudice requires a petitioner to show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial

disadvantage, infecting his entire trial with error of constitutional dimensions." *U.S. v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

A procedural default will also be excused if the petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The Supreme Court has held that such an inquiry requires a petitioner "supplement[] a constitutional claim with a 'colorable showing of factual innocence.'" *Id.* at 495 (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986)). Maintaining this exception to the rule against reviewing procedurally defaulted claims serves as "an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty". *Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 492–93 (1976)).

Ground One

In ground one, Petitioner challenges the trial court's determination that he was not indigent for purposes of obtaining counsel despite the fact that he had filed for bankruptcy. (Doc. 1, at 6). The Sixth District determined the claim was waived by Petitioner for failure to comply with Ohio App. R. 9 as discussed below:

> In his first assignment of error, appellant argues that the trial court erred when it failed to find that appellant was indigent based solely upon the recommendation of the public defender following its investigation, which was not disclosed to appellant's counsel.
>
> The right to assistance of counsel is guaranteed under both the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 10 of the Ohio Constitution. *State v. Martin*, 103 Ohio St.3d 385, 816 N.E.2d 227, 2004–Ohio–5471, ¶ 22. Crim.R. 44 also mandates that the court appoint counsel for defendants who are unable to obtain counsel to represent the defendant at every stage of the proceedings for serious offenses and may appoint counsel for defendants charged with petty offenses unless the defendant waives this right. The term in Crim.R. 44(B), "unable to obtain counsel," has been interpreted to mean indigency as well as other factors which cause the defendant to be unable to obtain counsel. *State v. Knight*, 9th Dist. No. 11CA010034, 2012–Ohio–5816, ¶ 14, and *State v. Henley*, 138 Ohio App.3d 209, 219–220, 740 N.E.2d 1113 (9th Dist.2000).

The public defender has the initial responsibility to determine the indigency of a defendant who requests appointed counsel. R.C. §§ 120.05 and 120.15(D). The public defender's decision is subject to review by the court. R.C. § 120.05(A). The court's determination of whether indigency status is proper for a particular defendant is a matter left to the sound discretion of the trial court. *State v. Riegel*, 3d Dist. Nos. 14–11–27, 14–11–28, 2012–Ohio–4517, ¶ 26, quoting *Guisinger v. Spier*, 166 Ohio App .3d 728, 2006–Ohio–1810, 853 N.E.2d 320, ¶ 6. Therefore, on appeal, our standard of review is abuse of discretion. An abuse of discretion is more than an error of judgment; rather, it connotes that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

The county public defender is required to investigate the financial status of the person to be represented and provide the court with the results of its investigation upon request. R.C. 120.05(B). The trial court may also make a determination of the person's eligibility for appointed counsel. *Id.* Furthermore, the determination of indigency process should preserve as much confidentiality as possible regarding the defendant's financial status and only disclose the information needed for the court to makes its indigency status determination. Ohio Adm.Code 120:1–03(G).

Although it is the duty of all of the participants during trial to ensure that a proper appellate record is being created, Crim.R. 22 and *State v. Lewis,* 2d Dist. No. 23850, 2011–Ohio–1411, ¶ 28, ultimately appellant bears the duty to demonstrate where error occurs on the record. App.R. 9(B) and *State v. Perry,* 101 Ohio St.3d 118, 2004–Ohio–297, 802 N.E.2d 643, ¶ 6, quoting *State v. Fisher,* 99 Ohio St.3d 127, 2003–Ohio–2761, 789 N.E.2d 222, ¶ 7. Without a complete record, the appellate court must presume the regularity of the proceedings and the validity of the judgment. *State ex rel. Hoag v. Lucas Cty. Bd. of Elections,* 125 Ohio St.3d 49, 2010–Ohio–1629, 925 N.E.2d 984, ¶ 12, and *State v. Prince,* 71 Ohio App.3d 694, 698, 595 N .E.2d 376 (4th Dist.1991), citing *Knapp v. Edwards Laboratories,* 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1980).

If an appealable issue arises during trial, appellant has a duty to proffer contrary evidence in order for the appellate court to have a record to review the issue. Evid.R. 103(A)(2) and *State v. Chapin,* 67 Ohio St.2d 437, 444, 424 N.E.2d 317 (1981). Correspondingly, appellant has a duty to ensure that all of the evidence considered by the court is entered into the record and transmitted to the court of appeals or to take action to correct or supplement the record pursuant to App.R. 9 if there is an error or omission. *State v. Tyler,* 50 Ohio St.3d 24, 41, 553 N.E.2d 576 (1990), *superseded by constitutional amendment in part on other grounds as stated in State v. Smith,* 80 Ohio St.3d 89, 103, 684 N.E.2d 668 (1997), fn. 4 and *Maseck v. Lindav Properties,* 1st Dist. No. C–050528, 2006–Ohio–3721, ¶ 11. Otherwise, the appellate court must find that appellant waived any error that might have been reflected in the omitted record. *Smith* at 41. *Compare In re Holmes,* 104 Ohio St.3d 664, 2004–Ohio–7109, 821 N.E.2d 568, ¶ 19–20 (appellant does not waive any error if the omission in the record is due to the error of the court personnel and not appellant).

16

*****

> Upon a review of the transcript, we find that appellant waived any error relating to the determination of his indigency status because he failed to preserve the record by having the information regarding his financial status entered into the record so that the appellate court could review the determination. Without a complete record, we must presume the regularity of the proceedings. Furthermore, we note that appellant admitted that he would be able to pay for his counsel if he was released from jail. Since he never raised the issue of indigency again and was represented at trial, it is clear that he was able to find the resources to pay his attorney. Appellant's first assignment of error is not well-taken.

(Doc. 5-1, Ex. 1, at ¶¶ 3-13).

Under the *Maupin* standard, the Court must analyze whether the state court's application of a procedural rule was valid; therefore, barring federal habeas review on the merits. Here, the Sixth District found that Petitioner failed to preserve the record for appeal at trial pursuant to Ohio App. R. 9 by not submitting his financial information into the record. Petitioner alleges "[t]he record was clear that [his] access to assets, if any, were restricted by bankruptcy and divorce proceedings"; however, he provides no citation to the record on which to prove this allegation. (Doc. 7, at 2). Furthermore, Ohio App.R. 9(C) and (D) offer appellants alternative forms of evidence to submit in support of their claims if the record was not properly preserved, but Petitioner did not exercise this option. The state court relied upon a procedural rule which Petitioner failed to follow and, thus, the first prong of the *Maupin* standard is satisfied.

As for the second prong, it is apparent from the Sixth District's opinion that it enforced a sanction on Petitioner because it declined to discuss the merits of his assignment of error due to his failure to comply with Ohio App.R. 9. (Doc. 5-1, Ex. 1). Further, the third *Maupin* prong is met because Ohio App.R. 9 is a rule with a "discernible standard of application" and is, thus, "an adequate and independent state rule which bars federal review." *Banks v. Bradshaw*, 2008 WL 4356955, at *11 (N.D. Ohio); *see also Braun v. Morgan*, 2014 WL 814918, at *33 (N.D. Ohio).

17

Due to Petitioner's procedural default on ground one, the Court is foreclosed from reviewing its merits unless he can demonstrate some external factor as cause for the default and resulting prejudice. *Murray*, 477 U.S. at 488. Petitioner has failed to allege any cause for the default and thus, this Court need not address whether prejudice resulted. Moreover, he has not claimed actual innocence. Accordingly, the undersigned recommends the Court dismiss ground one of the Petition because it is procedurally defaulted.

Ground Two

In ground two, Petitioner argues the trial court abused its discretion and prevented a fair trial by consolidating the two indictments for purposes of trial. (Doc. 1, at 8). The Sixth District found that Petitioner had waived this claim by failing to contemporaneously object to the joinder at trial and proceeded into a plain error review. (Doc. 5-1, Ex. 1, at ¶¶ 14-20). The Court of Appeals addressed his claim as follows:

> In his second assignment of error, appellant argues that the trial court erred by ordering the two indictments to be tried together.
>
> *****
>
> Multiple offenses may be charged in the same indictment if the offenses are "of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A). *See also* R.C. 2941.04. Likewise, indictments may be tried together if the offenses could have been joined in a single indictment. Crim.R. 13. Because joinder of indictments for a single trial is favored for judicial economy, the defendant bears the burden of claiming prejudice to prevent the joinder and providing sufficient information for the trial court to weigh the right to a fair trial against the benefits of joinder. Crim.R. 14; *State v. Torres,* 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus; and *State v. Schaim,* 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992). The trial court's decision will not be overturned on appeal unless appellant can establish that the court abused its discretion. *Torres.*
>
> Appellant asserts on appeal for the first time that the evidence of the separate indictments in this case would not have been admissible in separate trials because the two indictments involve separate and distinct conduct. He further asserts that the joint trial created an accumulation of evidence which may have led the jury to convict him on both indictments.

First, appellant failed to present this issue to the trial court and has therefore waived the issue. Second, we find appellant's argument lacks merit. When evidence of the crimes contained in the two separate indictments would have been admissible at separate trials, there is no greater prejudice by allowing the evidence to be presented in a joint trial. *State v. Thomas,* 3d Dist. Nos. 1–11–25, 1–11–26, 2012–Ohio–5577, ¶ 21. Furthermore, even where evidence of the crimes contained in the two separate indictments would not have been admissible at the opposite, separate trial, the indictments can still be tried together where the "evidence of each crime is simple and distinct" and the jury is able to segregate the proof of each charge. *State v. Hamblin,* 37 Ohio St.3d 153, 159, 524 N.E.2d 476 (1988); *Drew v. U.S.,* 331 F.2d 85, 91 (D.C.Cir.1964) and *State v. Lott,* 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

In this case, the trial court concluded and we agree that the forgery acts and the failure to transfer proper title to a vehicle were part of a common course of criminal conduct to defraud others for monetary gain and all of the criminal acts occurred within the same eight-month time frame. Furthermore, the evidence related to each criminal charge could be easily separated and understood by the jury in its deliberations. Therefore, we find appellant failed to demonstrate that the trial court abused its discretion by consolidating these indictments for trial. Appellant's second assignment of error is found not well-taken.

(Doc. 5-1, Ex. 1, at ¶¶ 14-20).

The Sixth District applied the contemporaneous objection rule to dispose of ground two because Petitioner failed to raise an objection to the joinder at trial and thus, waived appellate review of the issue. Ohio Crim.R. 30(a), *see Osborne v. Ohio,* 495 U.S. 103, 124 (1990); *Scott v. Mitchell*, 209 F.3d 854, 865 (6th Cir. 2000). Petitioner does not contend that he objected to the joinder at trial, but rather that joinder was unconstitutional.

The Court of Appeals enforced the contemporaneous objection rule by proceeding into a plain error review of the issue. Importantly, "[a] state court's review of an issue for plain error is considered by the Sixth Circuit as the enforcement of a procedural default." *Jalowiec v. Bradshaw*, 2008 WL 312655, at *23 (N.D. Ohio), *aff'd*, 657 F.3d 293 (6th Cir. 2011) (citing *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004)). Thus, the appellate court clearly relied upon procedural bars in denying Petitioner's assignment of error. "The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state

19

ground barring federal review absent a showing of cause for the waiver and resulting prejudice". *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Jalowiec*, 2008 WL 312655, at *23 (citing *Williams*, 380 F.3d at 968). Accordingly, the first three prongs of the *Maupin* standard have been met. Lastly, Petitioner has not made a showing of cause and prejudice or a miscarriage of justice, thus, ground two should be dismissed.

Even if ground two is not procedurally defaulted, in reviewing the Sixth District's conclusion on this matter the Court finds it is not contrary to, or an unreasonable application of, federal law. *See* § 2254(d)(1). The Sixth District reasonably concluded that the two indictments, though for distinct crimes, were part of a common course of criminal conduct, as evidenced by their temporal proximity and similar goal of defrauding others for personal gain. Also, the evidence of each of these crimes was distinct and thus, the jury could easily discern what evidence supported conviction on each crime. Overall, Petitioner has not carried his burden in proving that prejudice resulted from the joinder of the indictments. *See Coley v. Bagley*, 706 F.3d 741, 753 (6th Cir. 2013).

Grounds Three and Five

 Petitioner raised grounds three and five in his appeal to the Sixth District but failed to raise them in his appeal to the Ohio Supreme Court. *Supra* pg. 10-12; (Doc. 5-1, Exs. 20 & 25). Ground five, as pertains to improper jury instructions, is somewhat subsumed in propositions three and four to the Ohio Supreme Court, but only as to certain instructions. Therefore, ground five's challenge to the entirety of the jury instructions was not presented to the Ohio Supreme Court, nor was any claim of prosecutorial or judicial misconduct. Fair presentation requires that the claims be presented at each level of state review so as to allow the state court a full opportunity to resolve any constitutional issues. *O'Sullivan*, 526 U.S. at 848; *Caver*, 349 F.3d at

346. The failure to do so will result in a waiver of those claims under *res judicata*. *Id*.; *State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982).

Petitioner did not present grounds three or five in his direct appeal to the Ohio Supreme Court and thus, the doctrine of *res judicata* applies. Petitioner did not raise known issues in his direct appeal contrary to the doctrine of *res judicata* and the highest state court was unable to review the merits of these claims due to his failure; thus, the first two prongs of the *Maupin* standard are satisfied.

*Res judicata* has long been held to be a state procedural bar with the effect that claims not raised on direct appeal will be dismissed. *See State v. Perry*, 226 N.E.2d 104 (Ohio 1967). *Res judicata* is a "firmly established and regularly followed" state practice on which to foreclose federal review of a constitutional claim. *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *see also Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001). Therefore, the third prong of the *Maupin* standard, adequacy and independence, is satisfied. *See Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004).

Petitioner has not asserted cause and prejudice or alleged actual innocence; accordingly the Court recommends grounds three and five of the Petition be dismissed as procedurally defaulted.

Ground Six

In his final ground for relief, Petitioner alleges the trial court violated his due process right in giving an accomplice jury instruction and making a comment regarding the co-defendant's sentencing. (Doc. 1, at 15). The Sixth District declined to hear the merits of this claim because Petitioner did not object to the instruction or comment at trial, and addressed the claim as such:

> In his sixth assignment of error, appellant argues that the trial court committed
> plain error by giving an accomplice jury instruction and improperly commenting

to the jury regarding an incident with the co-defendant outside the presence of the jury. Appellant acknowledges that he did not object to this comment at trial, but asserts that it constitutes plain error.

With respect to the forgery charges, the following evidence was admitted. Aaron Bramel, a Perkins Township police officer testified that he received a call about a possible forgery in June 2010. Bryan Myers, the manager of Vacationland Federal Credit Union, reported a possible forgery relating to some hail damage checks that had been cashed by possibly appellant for two properties (Sweetbriar Drive and Morningside Court). One check for $5,440.10 was issued by Motorist Mutual Insurance Company to appellant and Central Loan Administrative and Reporting, which is the mortgage company of Vacationland Federal Credit Union. The check was endorsed by appellant, next to his social security number, and another person, whose name is illegible.

The second check was issued by Motorist Mutual Insurance Company to appellant, Pam Newman, and Central Loan Administrative and Reporting. The check was endorsed by appellant, Pam Newman, and another name that is illegible. Both appellant's and Pam Newman's social security numbers are next to the signatures. There was nothing on the check to indicate that appellant had signed the check for Central Loan Administrative and Reporting. However, when Officer Bramel investigated the matter, he learned that Pam Newman had not signed the check and that Nicholas Lesch admitted he signed the check. There is no indication that Lesch signed on behalf of Central Loan Administrative and Reporting.

The checks were cashed at Ace America Cash Express. The officer identified photocopies of the checks and a photograph of the men who cashed the checks, appellant and another man who resembles Lesch. The officer identified a second photograph of Lesch cashing another check to himself from Susan and Alan Lesch. The officer contact Lesch, who admitted that he assisted appellant in cashing a check and Lesch would be paid $2,000. The officer also learned that appellant gave Lesch $1,200, which was the cost of doing the repair work (replaced mulch, repaired a window, and fixed a door). Appellant continued to contact Lesch but not for additional work. Lesch was charged with two counts of forgery related to cashing the checks. The complaint was not signed by Myers nor did the officer obtain an affidavit of forgery from Myers. The charges were dismissed by the Sandusky Municipal Court.

Nicholas Lesch testified that he owns Lesch Tree and Landscape Service and has been in business four years and had done some landscaping work for appellant in the past. Lesch testified in this case that he had been charged with two forgery counts as a result of his conduct. He also testified that he had reached a plea agreement with the prosecution to testify truthfully in exchange for entering a plea to two misdemeanors and hoped to get probation.

*****

When a defendant is charged with complicity and his accomplice testifies, R.C. § 2923.03(D) requires the court to give the following jury instruction:

> The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution. It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

In the case before us, the court made the following comments while giving the jury instruction:

> We've heard the testimony of an accomplice, Nicholas Lesch, another person who pleaded guilty to the same crime charged in this case and is said to be a, quote, unquote, accomplice. * * * Whether Nicholas Lesch was an accomplice and the weight to be given his testimony are matters for you to determine. Testimony of a person who you find to be an accomplice should be viewed with grave suspicion and weighed with great caution. * * * [A]nd I will tell you that he was sentenced this afternoon and there was an agreement as it relates to sentence, and he received community control sanction and he got a suspended six month sentence for the misdemeanor. You can take that into consideration. And that was something that was told to you from the witness stand, that he had an agreement with the State of Ohio.

Appellant takes issue with the fact that the court went beyond the requirement of the statute and added that the accomplice had been convicted and what sentence he received. Appellant argues that this additional comment prejudiced his case by causing the jury to believe that the accomplice must have been truthful because he received the sentence he had been promised for cooperating with the prosecution and testifying against appellant.

The basic purpose for the statutorily-mandated jury instruction is to ensure that the jury is informed that the testimony of an accomplice is inherently suspect and must be "viewed with suspicion and weighed with caution." *State v. Bell,* 8th Dist. No. 97123, 2012–Ohio–2624, ¶ 37. The better practice would be for a trial court to repeat verbatim the instruction on accomplice testimony contained in the statute. However, we do not find that the court's statements in this case were erroneous.

While the trial court went beyond the required jury instruction, his final comment about the sentence Lesch actually received did not constitute error. Often, the defense challenges that the prosecution concealed a plea agreement premised upon another defendant giving testimony in a separate case for a lesser recommended sentence for purposes of bolstering the witness's credibility. Likewise, the defense will cross-examine a witness about such a plea bargain to

demonstrate that the accomplice had a motive to lie. Therefore, the court's additional comment about the actual sentence was a further caution to the jury to be careful in evaluating the testimony of Lesch because he actually received the plea arrangement he sought. We find this conclusion far more logical that appellant's argument that the jury would have taken this comment to mean that Lesch must have been truthful because he received the sentence he wanted. Furthermore, even if we found that the trial court erred by revealing Lesch's actual sentence, any prejudice arising from the comment did not affect the outcome of the trial. There was sufficient evidence of appellant's complicity to commit forgery without Lesch's testimony. The fact that appellant cashed the checks without the signature of a representative of the bank, and had the check endorsed by his landscaper was sufficient to establish the crime. Appellant's sixth assignment of error is not well-taken.

(Doc. 5-1, Ex. 1, at ¶¶ 65-79).

The Sixth District applied the contemporaneous objection rule to dispose of Petitioner's ground six because he failed to raise an objection at the time of trial to either the instruction or the comment and thus, waived appellate review of the issue. Ohio Crim.R. 30(a), *see Osborne v. Ohio,* 495 U.S. at 124, *Scott*, 209 F.3d at 865. Petitioner does not contend that he objected to either incident at trial. The Court of Appeals enforced the contemporaneous objection rule by proceeding into a plain error review of the issue. *See Jalowiec v. Bradshaw*, 2008 WL 312655, at *23 (N.D. Ohio), *aff'd*, 657 F.3d 293 (6th Cir. 2011) (citing *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004)). Thus, the appellate court clearly relied upon procedural bars in denying Petitioner's assignment of error. The contemporaneous objection rule constitutes an adequate and independent procedural rule capable of barring federal review. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Jalowiec*, 2008 WL 312655, at *23 (citing *Williams*, 380 F.3d at 968). Accordingly, the first three prongs of the *Maupin* standard have been met.

Petitioner has not alleged or shown adequate cause to waive his procedural default and thus, this Court need not address whether prejudice resulted. Moreover, he has not claimed actual innocence. Accordingly, the undersigned recommends the Court dismiss ground six of the Petition because it is procedurally defaulted.

24

***Non-Cognizable Claims***

The Court will not have jurisdiction over Petitioner's claims for purposes of habeas corpus review if they do not "challenge the legality of his custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254. Indeed, "[t]he writ of habeas corpus is not available to remedy errors of only state law." *Smith v. Morgan*, 371 F. App'x 575, 582 (6th Cir. 2010) (citing 28 U.S.C. § 2254(a)); *see also Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("[a] claim based solely on an error of state law is not redressable through the federal habeas process.") (quoting *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)). Importantly, merely asserting a state law error violates the Federal Constitution is not sufficient to justify jurisdiction. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010).

Nevertheless, habeas relief may be available if an alleged error of state law subjected the petitioner to a "fundamentally unfair" criminal process. *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006). "[T]he category of infractions that violate fundamental fairness is defined very narrowly", and includes only state rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1977) (citations omitted)); *see also Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993). The habeas petitioner bears the burden to show "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Bey*, 500 F.3d at 521.

<u>Ground Four</u>

Petitioner alleges he was denied a fair trial where the trial court gave improper jury instructions regarding a certificate of title and proof of ownership for vehicle transfers. (Doc. 1, at 11). This claim was denied on the merits by the Sixth District stating:

> In his fourth assignment of error, appellant argues that the trial court erred as a matter of law and abused its discretion by giving improper jury instructions. It

25

became apparent to the court during the trial that appellant was eliciting testimony to argue that these customers were "owners" of their vehicles by their possession and use of the vehicles. The court asked appellant about the legal basis for these questions and warned him that if he continued to use the term "bone fide purchaser of a title," the court would instruct the jury that ownership of a vehicle is established by a certificate of title. After all of the customers had been cross-examined, the court gave appellant an additional opportunity to justify the questioning. However, after the state rested, the trial court gave the following jury instruction:

> The Court tells you what the applicable law is. I am permitted by law to clarify certain things from a legal perspective. Don't draw any inference, inference from that which I'm about to tell you, but there has been an issue that has arisen, and I want to read you three separate sections, parts, or reference three sections of the Revised Code. Two of them are under the motor vehicle section, which is Chapter 45, and the other is under the consumer protection section, which is Chapter 13.

> Under 4505.18, there's a prohibition that's set forth under that particular section that reads as follows: A party may not sell a motor vehicle, the ownership of which is not evidenced by an Ohio Certificate of Title.

> Under 4501.01, the Ohio Revised Code defines ownership and, in part, states this: Owner includes any person that has title to a motor vehicle.

> And then, finally, under the consumer protection chapter, which is 1345.06(E)(1): Sale of a motor vehicle requires certificate of title.

> What I'm saying to you, in essence, is there is a requirement in Ohio to prove ownership statutorily, that a party has a title to a vehicle.

> We receive our law in two separate ways; by way of statute, some of which are included within this book, and by way of case law. I have asked the attorneys to provide me with case law that contravenes the statute. If that is the case, and if they have case law that does that, I'll read that to you tomorrow.

And, when the court gave all the jury instructions following closing arguments, the court stated:

> The Court did take judicial notice of the fact and the law in Ohio, that in order to transfer property that relates to a motor vehicle, proof of ownership is a certificate of title. That's something that is noticed. You'll accept that as a factual circumstance and then you'll see how that fits into your deliberation process in this case.

Appellant's argument is based solely upon an alleged conflict between cases which hold that "equitable ownership" of a motor vehicle can be established in

other ways than by the certificate of title under R.C. § 4505.04. Appellant relies upon *State v. Rhodes,* 2 Ohio St.3d 74, 76, 442 N.E.2d 1299 (1982), (holding that "[f]or purposes of determining the commission of a theft offense under R.C. 2913.02, one need not hold a certificate of title to be in lawful possession of a motor vehicle"); *Grogan Chrysler–Plymouth, Inc. v. Gottfried,* 59 Ohio App.2d 91, 94, 392 N .E.2d 1283 (6th Dist.1978) ("R.C. 4505.04 was intended to apply to litigation where the parties were rival claimants to title * * * and to similar situations"); *State v. Shimits,* 10 Ohio St.3d 83, 85, 461 N.E.2d 1278 (1984) (in a forfeiture action, ownership of a motor vehicle may be proven by a manner other than the certificate of title); and *Preston v. Kelsey,* 6th Dist. No. L–85–352, 1986 WL 5376, *5 (May 9, 1986) (in a malicious prosecution case, plaintiff had possession of a motor vehicle under claim of title and, therefore, defendant lacked probable cause to institute an action for theft).

We find that none of these cases are applicable to the case before us. This case does not involve the issue of who is the rightful owner of the vehicle. Instead, the issue is whether appellant had a legal right to sell a vehicle under Ohio law and whether he sold these vehicles knowing that he could not transfer good title to the consumers. The theft is not of the motor vehicle, but of the purchase money that was given to obtain a certificate of title. Appellant's fourth assignment of error is not well-taken.

(Doc. 5-1, Ex. 1, at ¶¶ 51-53).

In his Reply, Petitioner argues "[t]he Court of Appeals, in denying the assignment of error, essentially indicated that Petitioner's reliance on an Ohio Supreme Court case was not enough." (Doc. 7, at 4). It is apparent here that the Petitioner is asking this Court to re-evaluate the state court's application of state law on the sale of motor vehicles.  However, rulings by state courts with respect to state law are binding on the federal courts. *Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). Further, federal habeas courts must defer to a state court's interpretation and definition of its criminal offenses, in this case theft. *See Jackson v. Virginia*, 443 U.S. 307, 324 n.16 (1979).  Petitioner cannot challenge a state law interpretation merely by framing the issue in terms of the federal constitution. *See Wilson,* 562 U.S. at 5. Lastly, Petitioner has not proven the state court's interpretation created a "fundamentally unfair" trial, and, thus, the Court recommends ground four be dismissed as non-cognizable. *See Bey*, 500 F.3d at 521; *Estelle*, 502 U.S. at 67–68.

### CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, the undersigned recommends the Court deny the Petition.

s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).